**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee for the Benefit of Holders of Arbor Multifamily Mortgage Securities Trust Series 2021-MF3, Multifamily Mortgage Pass-Through Certificates, acting by and through Midland Loan Services, a division of PNC Bank, National Association, as Special Servicer, and WILMINGTON TRUST, NATIONAL ASSOCIATION, as Trustee for the Benefit of the Beneficial Owners of Arbor Multifamily Mortgage Securities Trust Series 2022-MF4, Multifamily Mortgage Pass-Through Certificates Series 2022 MF4, acting by and through Midland Loan Services, a division of PNC Bank, National Association, as Special Servicer,<br><br>Plaintiffs,<br><br>v.<br><br>345 FAIR ST LLC, 185 E. 33RD ST LLC, 328 33RD ST LLC, 365 12TH AVENUE LLC, 198 PRESIDENT ST LLC, 2650 LEHMAN LLC, MEGA 712 BROADWAY LLC, and LEIB STEINER, as administrator of the Estate of Mendel Steiner,<br><br>Defendants. | Civil Action No: ___________________<br><br>**COMPLAINT** |

Plaintiffs Wells Fargo Bank, National Association, as Trustee for the benefit of the holders of Arbor Multifamily Mortgage Securities Trust Series 2021-MF3 Mortgage Pass-through Certificates Series 2021-MF3 ("Wells Fargo Lender") and Wilmington Trust, National Association, as Trustee for the Benefit of the holders of Arbor Multifamily Mortgage Securities Mortgage Pass-through Certificates Series 2022-MF4 ("Wilmington Lender" and together with

Wells Fargo Lender, collectively, "Plaintiffs" or "Lenders"), each acting by and through its special servicer, Midland Loan Services, a division of PNC Bank, National Association ("Special Servicer"), by and through their undersigned attorneys, as and for their complaint (the "Complaint") against 345 Fair St LLC, 185 E. 33rd St LLC, 328 33rd St LLC, 365 12th Avenue LLC, 198 President St LLC, 2650 Lehman LLC, Mega 712 Broadway LLC (collectively, the "Borrower Defendants" or "Borrowers" and each a "Borrower Defendant") and Leib Steiner, in his capacity as administrator of the Estate of Mendel Steiner (the "Guarantor" and together with the Borrower Defendants "Defendants" and collectively, the "Defendants" or "Borrowers"), respectfully allege as follows:

## SUMMARY OF ALLEGATIONS

1. Plaintiffs are the owners and holders of four (4) defaulted loans with a combined original unpaid principal balance of $56,682,000. The loans are secured by real property in New Jersey securing three of the loans (the "New Jersey Properties") and real property in Ohio securing the fourth Loan (the "Ohio Property" and, together with the New Jersey Properties, the "Properties" and each a "Property"). When the loans were made in September and November of 2021, Mendel Steiner controlled and indirectly owned one-hundred percent (100%) of the membership interests in each borrower entity and served as the guarantor for each loan. Mr. Steiner died in January 2025 by suicide. His estate and the Properties are being administered by his relative, Leib Steiner (aka Leo Gold).

2. All four loans are in default for many different reasons. Specifically, the Borrower Defendants are in breach of all four Loan Agreements because (i) Debt Service has not been paid since June 2026 and Mr. Gold has indicated Borrowers will not be making any future payments, (ii) none of the loans has a guarantor because Mr. Gold has failed and refused to replace Mr.

Steiner, leaving Lenders with naked loans, *i.e.*, a loan with no guarantor to stand behind it, (iii) Mr. Gold has refused to provide any financial information regarding the Properties for several months, (iv) Mr. Gold has also failed to set up the cash-management account and cash sweep that the Loan Documents require and as a result, the Borrower Defendants are effectively stealing the net revenue of the Properties each month, which totals approximately $490,000, (v) Restrictive Covenants prohibiting the sale or encumbrance of the Passaic County Properties and the Mega Property were recorded prior to origination of the Loans secured by those properties, (vi) a tax lien was recorded against the 365 Properties, and (vii) the condition of each of the Properties has declined substantially, current management has no capital improvement plan, and there is substantial and significant deferred maintenance that must be addressed at each Property.

3. Borrowers also knowingly defrauded Lenders at loan origination, representing that the Properties were not subject to any liens or encumbrances and that execution of the loan documents would not breach any other instrument to which Borrowers were a party. In fact, just days before each loan was originated, instruments were recorded that prohibited the sale of, or any other form of encumbrance on, the New Jersey Properties, which secure three of the loans.

4. That Borrowers defrauded Plaintiffs is consistent with public reports that Mr. Steiner was a major fraudster. Public reports following his death have implicated Mr. Steiner in a massive Ponzi scheme. According to those reports, part of that fraud involved transfers to Mr. Steiner totaling more than $300 million from his business partner and attorney, Mark J. Nussbaum, for the purpose of showing adequate liquidity to lenders like Plaintiffs. Mr. Nussbaum is now facing criminal charges in New York state. There are also reports indicating that one of the Borrower Defendants in this case, 365 12th Avenue LLC, was involved in Mr. Steiner's fraud. **Exhibit 1**.

5. Unsurprisingly, Mr. Steiner's estate now faces verified claims in probate court that exceed $650 million, including claims by Plaintiffs and other similarly situated lenders. **Exhibits 2A-2G**. In one of those claims, Mr. Steiner acknowledged that two of the Borrower Defendants – the 185 E. 33rd St Defendant and the 365 12th Avenue Defendant – took out substantial loans in breach of the Loan Agreements for the 365 Loan and the 345 Loan. **Exhibit 2C**. That additional indebtedness is also a default under the Loan Documents and gives rise to full recourse liability against those defendants.

6. Borrowers cannot reasonably dispute these defaults. Accordingly, Plaintiffs respectfully request judgments against the Borrower Defendants and the Guarantor in an amount not less than the entire Indebtedness for all four loans, inclusive of all costs, expenses and attorneys' fees.[1]

**PARTIES**

7. Plaintiff Wells Fargo Lender is a national banking association organized and existing under the laws of the United States of America, acting as trustee for a trust that has elected to be treated as a real estate mortgage investment conduit under the Internal Revenue Code of 1986. Plaintiff is a citizen of the State of South Dakota where it maintains its principal office at 101 N 4th Avenue, Sioux Falls, South Dakota 57104.

8. Plaintiff Wilmington Lender is a national banking association organized and existing under the laws of the United States of America, acting as trustee for a trust that has elected to be treated as a real estate mortgage investment conduit under the Internal Revenue Code of 1986. Plaintiff is a citizen of the State of Delaware where it maintains its principal office at 1100 North Market Street, Wilmington, Delaware 19890.

---

[1] Capitalized terms not defined in this Complaint have the meanings ascribed to them in the Loan Documents or the various schedules attached hereto.

9. Defendant 345 Fair St LLC (the "345 Fair St Defendant") is a New Jersey limited liability company with its principal place of business in Brooklyn, New York. 345 Fair St Defendant is a citizen of the State of New York because, at the time of his death, Mendel Steiner ("Decedent Steiner"), who controlled and indirectly held one-hundred percent (100%) of said defendant's membership interests, resided in Brooklyn, New York.

10. Defendant 185 E. 33rd St LLC (the "185 E. 33rd St Defendant") is a New Jersey limited liability company with a principal place of business in Brooklyn, New York. 185 E. 33rd St Defendant is a citizen of the State of New York because, at the time of his death, Decedent Steiner, who controlled and indirectly held one-hundred percent (100%) of said defendant's membership interests, resided in Brooklyn, New York.

11. Defendant 328 33rd St LLC (the "328 33rd St Defendant" and, together with the 345 Fair St Defendant and the 185 E. 33rd St Defendant, the "345 Defendants") is a New Jersey limited liability company with its principal place of business in Brooklyn, New York. 328 33rd St Defendant is a citizen of the State of New York because, at the time of his death, Decedent Steiner, who controlled and indirectly held one-hundred percent (100%) of said defendant's membership interest, resided in Brooklyn, New York.

12. Defendant 365 12th Avenue LLC (the "365 12th Avenue Defendant") is a New Jersey limited liability company with a principal place of business in Brooklyn, New York. 365 12th Avenue Defendant is a citizen of the State of New York because, at the time of his death, Decedent Steiner, who controlled and indirectly held one-hundred percent (100%) of said defendant's membership interests, resided in Brooklyn, New York.

13. Defendant 198 President St LLC (the "198 President St Defendant" and, together with the 365 12th Avenue Defendant, the "365 Defendants") is a New Jersey limited liability

company with a principal place of business in Brooklyn, New York. 198 President St Defendant is a citizen of the State of New York because, at the time of his death, Decedent Steiner, who controlled and indirectly held one-hundred percent (100%) of said defendant's membership interests, resided in Brooklyn, New York.

14. Defendant 2650 Lehman LLC (the "Lehman Defendant") is an Ohio limited liability company with a principal place of business in Brooklyn, New York. Lehman Defendant is a citizen of the State of New York because, at the time of his death, Decedent Steiner, who controlled and indirectly held one-hundred percent (100%) of said defendant's membership interests, resided in Brooklyn, New York.

15. Defendant Mega 712 Broadway LLC (the "Mega Defendant") is a New Jersey limited liability company with a principal place of business in Brooklyn, New York. The Mega Defendant is a citizen of the State of New York because, at the time of his death, Decedent Steiner, who controlled and indirectly held one-hundred percent (100%) of said defendant's membership interests, resided in Brooklyn, New York.

16. Defendant Leib Steiner (aka, Leo Gold) is named solely in his capacity as administrator of the Estate of Mendel Steiner (the "Guarantor" or "Steiner Estate Defendant") as successor to Decedent Steiner's obligations pursuant to the Guaranty. Steiner Estate Defendant is a citizen of the State of New York because Decedent Steiner resided in New York at the time of his death.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332 because the amount in controversy is in excess of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship as between Plaintiffs and each Defendant.

18. Venue is proper in this judicial district because each Defendant undertook substantial activities relating to the Loans (as defined herein) in New York, including negotiating and signing the relevant Loan Documents (as defined herein).

19. Venue is also proper in this judicial district because in Section 16.01 of each Loan Agreement (as defined herein) Plaintiffs and the Borrower Defendants agreed that any legal suit arising out of the Loan Documents may be instituted in any state or federal court in the City of New York, County of New York. Further, each Borrower Defendant waived any objection based on venue or forum non conveniens. Section 22 of each Recourse Guaranty contains a materially identical provision as to Guarantor.

20. Venue is also proper in this judicial district because in Section 22 of each Recourse Guaranty (as defined herein), Guarantor submitted to jurisdiction in any state or federal court in the City of New York, County of New York, and State of New York.

## THE LOANS AND THE LOAN DOCUMENTS

21. Between September 15, 2021 and November 30, 2021, Arbor Private Label, LLC, a Delaware limited liability company (the "Original Lender"), made four separate mortgage loans (each a "Loan" and collectively, the "Loans") to the Borrowers in the aggregate original principal amount of $56,682,000.00, each secured by one or more of the Properties.

22. Each Loan, the Borrower(s) obligated thereon, the original principal amount thereof, and the Property or Properties securing the same are identified on **Schedule 1** annexed hereto.

23. Each Loan is evidenced by a Loan and Security Agreement (each, a "Loan Agreement") executed by and between the applicable Borrower or Borrowers and Original Lender, dated as of the date set forth on **Schedule 2** annexed hereto. Where one or more Borrowers are

obligated on a loan, such Borrowers executed a single Loan Agreement and are jointly and severally liable thereunder. True and correct copies of the Loan Agreements are annexed hereto as **Exhibits 3-6**.

24. Each Loan is further evidenced by a Promissory Note (each, a "Note") executed by the applicable Borrower or Borrowers and made payable to the order of Original Lender in the amount of the corresponding Loan, dated as of the date of the corresponding Loan Agreement. Where more than one Borrower is obligated on a Loan, the obligations of such Borrowers under the corresponding Note are identified on **Schedule 2** annexed hereto, and true and correct copies are annexed hereto as **Exhibits 7-10**.

25. Each Borrower's obligations under its Note and Loan Agreement are secured by a first-priority mortgage, assignment of leases and rents, security agreement and fixture filing encumbering the Property owned by such Borrower (each, a "**Security Instrument**"), executed by the applicable Borrower or Borrowers for the benefit of Original Lender and recorded in the county in which the corresponding Property is located. The Security Instruments, including the date and place of recording of each, are identified on **Schedule 3** annexed hereto. True and correct copies of the Security Instruments are annexed hereto as **Exhibits 11-14**.

26. Under each Security Instrument, the applicable Borrower absolutely and unconditionally assigned to Original Lender all Leases and Rents relating to the corresponding Property.

27. Each Borrower's obligations under its Note and Loan Agreement are further guaranteed by Guarantor, as successor to Decedent Steiner, pursuant to a Guaranty of Non-Recourse Obligations dated as of the date of the corresponding Loan Agreement (each, a

"Recourse Guaranty"). The Recourse Guaranties are identified on **Schedule 4** annexed hereto, and true and correct copies are annexed hereto as **Exhibits 15-18**.

28. In addition to the Loan Agreements, the Notes, the Security Instruments and the Recourse Guaranties, each Borrower executed and delivered to Original Lender additional documents and instruments in connection with the origination of the corresponding Loan, each dated as of the date of the corresponding Loan Agreement (collectively with the foregoing, the "Loan Documents").

29. Decedent Steiner was, at origination and at all times thereafter until his death, the indirect one-hundred percent (100%) owner of each Borrower and was designated the Key Principal and the Guarantor under each Loan. Decedent Steiner materially benefitted from Original Lender's making of the Loans.

30. On or about the date of origination of each Loan, Original Lender assigned such Loan to Arbor JPM PL Funding, LLC, a Delaware limited liability company ("AJPLF Lender"). AJPLF Lender thereafter reassigned each Loan to Original Lender, and Original Lender assigned each Loan and the corresponding Loan Documents to the applicable Plaintiff, as trustee of the securitization trusts identified on **Schedule 5** annexed hereto.

31. Plaintiffs' acquisition of the Notes is evidenced by a series of allonges to the Notes, which are identified on **Schedule 2** annexed hereto and true and correct copies of which are annexed to the corresponding Notes.

32. Through a series of assignments, each Security Instrument was assigned from Original Lender to the relevant Plaintiff, and each such assignment was recorded in the applicable land records, all as more fully described on **Schedule 6** annexed hereto (collectively, the

"Assignments"). True and correct copies of the Assignments are annexed hereto as **Exhibits 19-30**.

33. Plaintiffs, through their custodian, are in possession of and are the holders of the original Notes, together with the allonges thereto.

34. By virtue of the foregoing, Plaintiffs have been assigned and possess all right, title and interest in and to the Loan Documents, and are the owners and holders of the Loans and of the Recourse Guaranties, entitled to all of the rights and remedies set forth therein.

## CONSENT TO RECEIVER

35. Each Security Instrument provides that, upon the occurrence and during the continuance of an Event of Default, and regardless of the adequacy of Lender's security or Borrower's solvency, Lender may apply for the appointment of a receiver for the Property, and that Borrower, by its execution of the Security Instrument, "expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte*, if permitted by applicable law," and "consents to shortened time consideration of a motion to appoint a receiver." *See* Security Instrument § 3(e).

36. The Lehman Security Instrument goes further, indicating that the Lehman Borrower "acknowledges and agrees that the appointment of a receiver is necessary to preserve and maintain and prevent irreparable harm to the Mortgaged Property," agrees that a receiver "shall be appointed . . . without bond," and "specifically waives any requirements imposed by any statutory or common law standard with respect to the appointment of a receiver, and . . . waives any right to challenge the appointment of a receiver and any right to appeal with respect to the appointment of a receiver." *See* Lehman Security Instrument § 11(c).

## RECOURSE OBLIGATIONS AND THE RECOURSE GUARANTIES

37. Section 3.01 of each Loan Agreement provides that, except as otherwise provided in Article 3 thereof, Borrower shall have no personal liability for the repayment of the Indebtedness, and that Lender's recourse shall be limited to the Mortgaged Property and other collateral.

38. Article 3 of each Loan Agreement sets forth exceptions to that limitation. Section 3.02(a) provides that Borrower shall be personally liable for the portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of, among other things, (i) the misapplication, misappropriation or conversion of Rents to which Lender is entitled under the Loan Documents, (ii) the failure to apply Rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and to Debt Service Amounts as and when due, (iii) the failure to pay charges for labor or materials or other charges that can create liens on the Mortgaged Property, (iv) waste or abandonment of the Mortgaged Property, and (v) the breach of any representation, warranty or covenant set forth in the lockbox provisions of Section 4.02(j).

39. Section 3.02(b) of each Loan Agreement provides that "Borrower shall be personally liable to Lender for the repayment of all of the Indebtedness, and the Mortgage Loan shall be fully recourse to Borrower," upon the occurrence of, among other things, (i) a breach of Section 4.02(d) of each Loan Agreement, (ii) "a Transfer . . . that is not permitted under this Loan Agreement or any other Loan Document" or (iii) "a failure to establish a Deposit Account upon the occurrence of a Cash Management Period in accordance with Section 4.02(j)."

40. Pursuant to Section 3 of each Recourse Guaranty, Guarantor "absolutely, unconditionally and irrevocably guarantee[d] to Lender as a primary obligor the full and prompt payment and performance when due, whether at maturity or earlier, by reason of acceleration or

otherwise, and at all times thereafter," of the "Guaranteed Obligations," including all amounts, obligations and liabilities owed to Lender under Article 3 of the corresponding Loan Agreement, including the indemnity obligations described in Section 3.04 thereof and Borrower's obligations under the Environmental Indemnity Agreement.

41. Section 5 of each Recourse Guaranty provides that the Recourse Guaranty "constitute[s] an irrevocable present and unconditional guaranty of payment and not merely a guaranty of collection," may not be revoked, and "shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs)."

42. Section 17 of each Recourse Guaranty further requires Guarantor to maintain a minimum Net Worth and minimum Liquidity, and to deliver to Lender, within sixty (60) days after the end of each calendar year, a statement of net worth and a certification of compliance with those criteria. The minimum Net Worth and Liquidity figures for each Loan are set forth in Schedule 4.

## **DEFAULTS**

*Impermissible Additional Indebtedness*

43. Section 4.02(d)(1)(E) of each Loan Agreement provides that each Borrower Defendant shall not incur any additional indebtedness other than the Loans. Specifically, each Loan Agreement provides that Borrower "shall have no material financial obligation under any . . . loan agreement, other agreement or instrument to which Borrower is a party . . . other than [its] obligations under the Loan Documents and obligations secured by the Mortgaged Property."

44. The 365 12th Avenue Defendant and the 185 E. 33rd St Defendant both incurred impermissible debt. Specifically, the 185 E. 33rd St Defendant is an obligor on a $60 million loan from a lender named Blueberry Funding LLC (the "Blueberry Lender") and has confessed

judgment under the note for that loan, as reflected in a verified claim submitted against the Estate of Mendel Steiner by Blueberry Lender. That same verified claim includes a note and guaranty from Mr. Steiner to Blueberry Lender on behalf of the 365 12th Avenue Defendant in the amount of $2.5 million.

*Impermissible Transfers due to Death of Decedent Steiner*

45. Section 11.03(e)(1) of each Loan Agreement provides that if "a Key Principal or Guarantor that is a natural person dies, or if Control of Borrower, Guarantor, or Key Principal is Transferred, or if a Restricted Ownership Interest in Borrower, Guarantor, or Key Principal would be Transferred as a result of the death of a Person . . . Borrower must notify Lender in writing within ninety (90) days in the event of such death," and that "[u]nless waived in writing by Lender, the deceased shall be replaced by an individual or entity within one hundred eighty (180) days," subject to Borrower's satisfaction of the conditions set forth in subsections (A) through (C) thereof, including delivery to Lender of an assumption agreement acceptable to Lender or a substitute Non-Recourse Guaranty in a form acceptable to Lender.

46. Section 11.03(e)(2) provides that "the period for replacement [of Guarantor] may be extended by Lender to a date not more than one year from the date of such death."

47. Decedent Steiner died on January 9, 2025.

48. Borrowers failed to replace Decedent Steiner as Guarantor and Key Principal within 180 days of his death and within the one-year maximum period.

49. Lenders have not waived, in writing, the requirement that Decedent Steiner be replaced as Guarantor for each Loan.

50. To date, Decedent Steiner still has not been replaced.

51. "Transfer" is defined in each Loan Agreement to include "a sale, assignment, transfer or other disposition (whether voluntary, involuntary, or by operation of law)" and "a withdrawal, retirement, removal or involuntary resignation of any owner or manager of a legal entity."

52. Upon Decedent Steiner's death, direct and/or indirect membership interests in, and Control of, each Borrower were Transferred to Decedent Steiner's estate by operation of law.

53. Because Borrowers thereafter failed to comply with Section 11.03(e) of the Loan Agreements, those Transfers are not permitted under the Loan Agreements and constitute impermissible Transfers.

54. Pursuant to Section 14.01 of the Loan Agreement, an Event of Default occurs upon the occurrence of any Transfer not permitted by the Loan Documents.

55. Events of Default have accrued as to each Loan due to the failure of each Borrower Defendant to comply with the requirements of Section 11.03(e) following the death of Decedent Steiner.

*Payment Defaults*

56. Section 2.02(a)(3) of each Loan Agreement provides that "[c]onsecutive monthly debt service installments, each in the amount of the applicable Monthly Debt Service Payment, shall be due and payable on the First Payment Date, and on each Payment Date thereafter until the Maturity Date, at which time all Indebtedness shall be due."

57. Section 14.01(a)(1) of each Loan Agreement provides that it is an automatic Event of Default for Borrower to fail "to pay or deposit (i) when due for any Monthly Debt Service Payment, (ii) when due any amount due on the Stated Maturity Date and (iii) when due any amount required by the Note, this Loan Agreement or any other Loan Document."

58. The Borrower Defendants failed to make the Monthly Debt Service Payment[s] due under each Loan for July 2026 and August 2026 and the amounts due remain unpaid. Accordingly, an Event of Default has accrued under Section 14.01(a)(1) of each Loan Agreement as to each Loan.

59. Section 14.02(a) of each Loan Agreement provides that, if an Event of Default has occurred and is continuing, "the entire unpaid principal balance of the Mortgage Loan, any Accrued Interest, interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other Indebtedness, at the option of Lender, shall immediately become due and payable, without any prior written notice to Borrower."

60. Pursuant to letters dated July 14, 2026 (the "July 14th Default Letters"), Plaintiffs elected to accelerate all of the Loans, and all amounts outstanding under the corresponding Loan Documents became immediately due and owing, together with interest accruing at the Default Rate. See **Exhibits 31A-31D**.

61. As of August 21, 2026, the amounts due and owing under the Loans, inclusive of interest accruing at the Default Rate, protective advances, and Lenders' costs and expenses (including attorneys' fees), exceed $55,412,553.92.

62. Borrowers' debt service payment for July 2026 was returned for insufficient funds. Afterwards, Mr. Gold told Mr. Chase that the July 2026 debt service payment was not going to be made. To date, Lender has not received the debt service payments due under the Loan Documents for either July or August 2026. Mr. Gold has not indicated why Borrowers have willfully ignored their payment obligations.

*Property Condition Defaults*

63. Section 6.02(b) of each Loan Agreement requires that each Borrower "pay the expenses of operating, managing, maintaining, and repairing the Mortgaged Property . . . keep the Mortgaged Property in good repair and marketable condition (ordinary wear and tear excepted) [and] restore or repair promptly . . . any damaged part of the Mortgaged Property."

64. Section 14.01(a)(14) of each Loan Agreement provides that it is an automatic Event of Default "if the Mortgaged Property becomes subject to any mechanic's, materialman's or other Lien other than a Lien for any Taxes not then due and payable and the Lien remains undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days."

65. Section 6.02(c)(1) of each Loan Agreement provided that Borrower agreed to "not commit waste or abandon or (ordinary wear and tear excepted) permit impairment or deterioration of the Mortgaged Property."

66. Midland's representative, Matthew Chase, visited and inspected the Properties on July 16, 2026 and July 17, 2026.

67. During those inspections, he observed that the Properties are in poor condition and are not being adequately operated, maintained or repaired.

68. Borrower Defendants appear to have failed to pay the ordinary expenses of operating, managing, maintaining and repairing the Properties.

69. That failure is evidenced by what Mr. Chase found during his inspection of the Properties. For instance, (1) trash and debris were scattered through multiple properties, (2) mold was discovered in occupied units, (3) two properties have no gutters or downspouts, and (4) there are multiple broken windows.

70. The property managers did not have capital improvement plans for any of the Properties. During one inspection, an exasperated tenant pointed out multiple deferred

maintenance issues in their unit to the Borrower representative and their property manager, the most egregious of which was pervasive mold in their bathroom.

71. And that is just what Mr. Chase was able to observe. He was given full access to only two (2) occupied units at each Property and was not provided a current rent roll for any Property. Mr. Gold repeatedly requested that Mr. Gold provide rent rolls and financial statements for the Properties. At the inspections, Mr. Gold said he would provide that information, but he has still failed to do so.

72. Accordingly, Borrowers have committed waste and have permitted the Properties to fall into a severe state of disrepair.

*Lockbox Defaults*

73. Any Event of Default triggers a "Cash Management Period," as defined in each of the Loan Agreements. Because of the numerous Events of Default detailed herein, a Cash Management Period has commenced under each Loan.

74. Section 4.02(j)(1) of each Loan Agreement provides that Borrower must "promptly, but not later than ten (10) Business Days following receipt of written notice from Lender that a Cash Management Period has commenced" set up a Deposit Account pursuant to a deposit account control agreement (a "DACA") in a form acceptable to Lender into which all Rents and other revenue from the Mortgaged Property must be deposited.

75. Section 4.02(j)(4) of each Loan Agreement provides that during a Cash Management Period, Borrower must instruct its property managers to "deliver all payments due under such accounts directly to the Deposit Account." Those funds must be deposited "within one (1) Business Day of receipt."

76. Section 14.01(a)(13) of each Loan Agreement provides that it is an automatic Event of Default if Borrower fails to comply with the lockbox requirements in Section 4.02(j).

77. In the July 14th Default Letters, Lenders notified Borrowers in writing that a Cash Management Period had commenced under each Loan and demanded that Borrowers comply with the requirements of Section 4.02(j). **Exhibits 31A-31D**.

78. By letters dated August 4, 2026, Lenders notified Borrowers that they had failed to establish a Deposit Account pursuant to Loan Agreement Section 4.02(j)(1) and declared separate Events of Default. **Exhibits 32A-32D**.

79. Borrower Defendants have yet to establish a Deposit Account or enter into a DACA acceptable to Lenders at a Deposit Bank, and they have generally failed to comply with the obligations set forth in Loan Agreement Section 4.02(j).

80. Historical financial information submitted to Lenders by Borrower Defendants indicates that the Properties generate approximately $1,469,063 in quarterly net operating income ("NOI"), broken down as follows:

a. Lehman Property: $401,900

b. Mega Property: $289,173

c. 345 Fair St Properties: $359,940

d. 365 12th Ave Properties: $418,050

81. On a monthly basis, they generate approximately $489,688 in NOI, broken down as follows:

a. Lehman Property: $133,967

b. Mega Property: $96,391

c. 345 Fair St Properties: $119,980

d. 365 12th Avenue Properties: $139,350

82. Given that the Borrower Defendants have ceased making payments on the Loans and have not set up a lockbox account, they are diverting Rents and effectively stealing as much as $489,688 from Lenders on a monthly basis. That means Borrowers have failed to remit to the lockbox $979,376 just for the months of July and August 2026.

83. By reason of the foregoing, an Event of Default has accrued under Section 14.01(a)(13) of each Loan Agreement as to each Loan.

*Lien-Related Defaults*

84. Borrowers represented in Section 4.01(r) of each Loan Agreement that there were "no judgments or liens of any nature against" Borrower or the Properties "except for tax liens not yet due."

85. Borrowers represented in Section 4.01(p) of the Loan Agreements that their "execution and delivery of th[e] Loan Agreement[s] and the other Loan Documents . . . will [not] conflict with or result in any breach or violation of . . . any . . . instrument to which Borrower[s] [were] a party or to which Borrower[s], the [Properties], or other assets of Borrower[s] are subject."

86. Section 14.01(a)(5) of the Loan Agreements provides that it is an automatic Event of Default "if any warranty, representation, covenant, or statement of [a] Borrower . . . is false, inaccurate or misleading in any material respect when made."

87. Sections 14.01(a)(6)(A) and (D) of the Loan Agreements provide that it is an automatic Event of Default if a Borrower commits fraud, makes an intentional misrepresentation, or omits facts in connection with the "application for, or creation of the Indebtedness . . . or [in] any Loan Document."

88. Section 14.01(a)(14) of the Loan Agreements provides that it is an Event of Default if a mechanic's lien is recorded against the Properties and is not released within thirty (30) days.

89. On September 9, 2021, less than a week before the 345 Loan closed, an instrument (the "Passaic Restrictive Covenant") was recorded against the properties in Passaic County, New Jersey that secure the 345 Loan (the "345 Properties") and the 365 Loan (the "365 Properties" and, together with the 345 Properties, the "Passaic Properties"). **Exhibit 33**.

90. The Passaic Restrictive Covenant provides that the borrower entities for those two loans could not sell or encumber any of the Passaic Properties without first getting the permission of a specific attorney:

> The LLC[s] shall not sell, ***mortgage***, assign, lease, convey, transfer, encumber, pledge, hypothecate or otherwise take any action creating a security interest in the LLC[s] and/or the [Properties] without the written consent of Law Offices of Chaim C Zlotowitz, Esq. PLLC

**Exhibit 33**.

91. On October 27, 2021, prior to closing the Mega Loan in November 2021, a substantively identical instrument (the "Mega Restrictive Covenant" and, together with the Passaic Restrictive Covenant, the "Restrictive Covenants") was recorded against the property in Gloucester County, New Jersey that secured the Mega Loan (the "Mega Property"). The Mega Restrictive Covenant also required the written permission of Mr. Zlotowitz before the Mega Property could be sold, mortgaged or otherwise encumbered. **Exhibit 34**.

92. A mechanic's lien dated November 12, 2025 in favor of Vertical Systems Elevator Co. in the amount of $25,631.70 was recorded against the Lehman Property in the Official Land Records of Hamilton County, Ohio on November 14, 2025 at Book 15543, Page 1809 (the "Vertical Systems Mechanic's Lien") and remains undischarged and of record. **Exhibit 35**.

93. A tax lien recorded against the 365 Properties for failure to pay 2021 sewer utilities was sold by the City of Paterson New Jersey to Tower DB XII Trust 2022-1 (the "Buyer") on December 16, 2022 and was recorded in the Land Records on February 6, 2023 as Instrument No. 2023004038 at Book M18361, Page 231 (the "Tax Lien") and remains undischarged and of record. **Exhibit 36**.

94. By reason of the foregoing, Events of Default accrued under Sections 14.01(a)(5), 14.01(a)(6)(A), 14.01(a)(6)(D), and 14.01(a)(14) of the Loan Agreements.

*Required Records Defaults*

95. Section 8.02 of the Loan Agreement requires that the Borrower Defendants provide Lenders with certain Required Records within forty-five (45) days of each calendar quarter.

96. To date, Borrower Defendants have not provided Lenders with the Required Records due for the quarter ending June 30, 2026.

97. Section 14.01(a)(18) of each Loan Agreement provides that it is an automatic Event of Default "if Borrower fails to deliver any Required Record in accordance with Section 8.02 hereof and such breach continues for thirty (30) days."

98. The Required Records for the quarter ending June 30, 2026 were due no later than August 15, 2026. By reason of the foregoing, an Event of Default has accrued under Section 14.01(a)(18) of each Loan Agreement as to each Loan.

*Defaults regarding Collection of Rents*

99. Pursuant to Section 3(a) of each Security Instrument, each Borrower "absolutely and unconditionally assign[ed] and transfer[red] to Lender all Leases and Rents (including all HAP Contracts and HAP Contract Payments)," and the parties "intend[ed] the assignments of Leases

and Rents to be effective immediately and to constitute absolute present assignments, and not assignments for additional security only."

100. Pursuant to Section 3(b) of each Security Instrument, Borrower's license to collect and receive the Rents subsists only "[u]ntil an Event of Default has occurred and is continuing."

101. Following an Event of Default and "without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, the revocable license granted to Borrower pursuant to Section 3(b) shall automatically terminate," and "without notice, Lender shall be entitled to all Rents as they become due and payable, including Rents then due and unpaid."

102. Upon the occurrence of the Events of Default described herein, Borrowers' licenses to collect the Rents automatically terminated.

103. As noted above, Borrowers have nonetheless continued to collect and retain the Rents for each Property and have not remitted them to Lenders.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Fraud as to the 345 Defendants)**

104. Lender repeats and realleges each of the allegations set forth in paragraphs 1 through 103 of this Complaint as if fully set forth herein.

105. The 345 Defendants executed the 345 Loan Agreement and the other documents related to the 345 Loan (the "345 Loan Documents").

106. In the 345 Loan Agreement, the 345 Defendants represented that there were no liens of any kind against the 345 Defendants or the 345 Properties except for liens for taxes not yet due. This was a material misrepresentation because the 345 Restrictive Covenant had been

recorded against the 345 Properties prior to the 345 Defendants' execution of the 345 Loan Documents.

107. In the 345 Loan Agreement, the 345 Defendants represented that their execution of the 345 Loan Documents would not cause a breach of any instrument to which they were a party. This was a material representation because the 345 Defendants' execution of the 345 Loan Documents constituted a breach of the 345 Restrictive Covenant.

108. At the time the 345 Defendants made these representations, Mr. Steiner — who controlled the 345 Defendants and personally executed the 345 Loan Documents on their behalf — knew that they were false, because he had personally caused the 345 Restrictive Covenant to be recorded against the 345 Properties on September 9, 2021, less than a week before the 345 Defendants executed the 345 Loan Documents representing that no such encumbrance existed.

109. The 345 Defendants intended that the Wells Fargo Lender rely on each of the above-described material misrepresentations in making the 345 Loan.

110. The Wells Fargo Lender in fact did rely on those material misrepresentations, to its detriment, in making the 345 Loan.

111. By reason of the foregoing, Wells Fargo Lender has been damaged in an amount to be determined at trial, but not less than $15,712,000.00, together with interest, costs, and attorneys' fees, and/or the 345 Restrictive Covenant should be declared void and unenforceable as against Wells Fargo Lender.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Fraud as to the 365 Defendants)**

112. Lender repeats and realleges each of the allegations set forth in paragraphs 1 through 111 of this Complaint as if fully set forth herein.

113. The 365 Defendants executed the 365 Loan Agreement and the other documents related to the 365 Loan (the "365 Loan Documents").

114. In the 365 Loan Agreement, the 365 Defendants represented that there were not liens of any kind against the 365 Defendants or the 365 Properties except for liens for taxes not yet due. This was a material misrepresentation because the 365 Restrictive Covenant had been recorded against the 365 Properties prior to the 365 Defendants' execution of the 365 Loan Documents.

115. In the 365 Loan Agreement, the 365 Defendants represented that their execution of the 365 Loan Documents would not cause a breach of any instrument to which they were a party. This was a material representation because the 365 Defendants' execution of the 365 Loan Documents constituted a breach of the 365 Restrictive Covenant.

116. At the time the 365 Defendants made these representations, Mr. Steiner — who controlled the 365 Defendants and personally executed the 365 Loan Documents on their behalf — knew that they were false, because he had personally caused the 365 Restrictive Covenant to be recorded against the 365 Properties on September 9, 2021, the same day the 345 Restrictive Covenant was recorded and less than a week before the 365 Defendants executed the 365 Loan Documents representing that no such encumbrance existed.

117. The 365 Defendants intended that the Wells Fargo Lender rely on each of the above-described material misrepresentations in making the 365 Loan.

118. The Wells Fargo Lender in fact did rely on those material misrepresentations, to its detriment, in making the 365 Loan.

119. By reason of the foregoing, Wells Fargo Lender has been damaged in an amount to be determined at trial, but not less than $16,425,000.00, together with interest, costs, and attorneys'

fees, and/or the 365 Restrictive Covenant should be declared void and unenforceable as against Wells Fargo Lender.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Fraud as to the Mega Defendant)**

120. Lender repeats and realleges each of the allegations set forth in paragraphs 1 through 119 of this Complaint as if fully set forth herein.

121. The Mega Defendant executed the Mega Loan Agreement and the other documents related to the Mega Loan (the "Mega Loan Documents").

122. In the Mega Loan Agreement, the Mega Defendant represented that there were not liens of any kind against the Mega Defendant or the Mega Property except for liens for taxes not yet due. This was a material misrepresentation because the Mega Restrictive Covenant had been recorded against the Mega Property prior to the Mega Defendant's execution of the Mega Loan Documents.

123. In the Mega Loan Agreement, the Mega Defendant represented that its execution of the Mega Loan Documents would not cause a breach of any instrument to which it was a party. This was a material representation because the Mega Defendant's execution of the Mega Loan Documents constituted a breach of the Mega Restrictive Covenant.

124. At the time the Mega Defendant made these representations, Mr. Steiner — who controlled the Mega Defendant and personally executed the Mega Loan Documents on its behalf — knew that they were false, because he had personally caused the Mega Restrictive Covenant to be recorded against the Mega Property on October 27, 2021, approximately one month before the Mega Defendant executed the Mega Loan Documents representing that no such encumbrance existed.

125. The Mega Defendant intended that the Wilmington Lender rely on each of the above-described material misrepresentations in making the Mega Loan.

126. The Wilmington Lender in fact did rely on those material misrepresentations, to its detriment, in making the Mega Loan.

127. By reason of the foregoing, Wilmington Lender has been damaged in an amount to be determined at trial, but not less than $9,975,000.00, together with interest, costs, and attorneys' fees, and/or the Mega Restrictive Covenant should be declared void and unenforceable as against Wilmington Lender.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Breach of the 345 Loan Agreement)**

128. Lender repeats and realleges each of the allegations set forth in paragraphs 1 through 127 of this Complaint as if fully set forth herein.

129. The 345 Loan Agreement is a valid and binding agreement.

130. Lender, at all relevant times, performed its obligations under the 345 Loan Agreement.

131. The 345 Defendants have each breached the 345 Loan Agreement and caused one or more Events of Default to occur thereunder.

132. An Event of Default has occurred under Section 14.01(a)(4) of the 345 Loan Agreement because the 185 E. 33rd St Defendant (one of the borrower entities for that loan) took out an unauthorized loan in breach of Section 4.02(d)(1)(E) of the 345 Loan Agreement.

133. An Event of Default has occurred under Section 14.01(b)(1) of the 345 Loan Agreement because the 345 Defendants failed to replace Decedent Steiner as Guarantor within one year of his death on January 9, 2025, as required by Loan Agreement Section 11.03(e).

134. An Event of Default has occurred under Section 14.01(a)(1) of the 345 Loan Agreement because the 345 Defendants have failed to make their July 2026 and August 2026 Monthly Debt Service payments and have also failed to pay all amounts due under the Loan Documents following Lenders' acceleration of the debt.

135. An Event of Default has occurred under Section 14.01(a)(13) of the 345 Loan Agreement because, following the commencement of a Cash Management Period, the 345 Defendants failed to comply with the lockbox requirements set forth in Loan Agreement Section 4.02(j) and those breaches have yet to be cured.

136. An Event of Default has occurred under Section 14.01(a)(18) of the 345 Loan Agreement because the 345 Defendants failed to timely deliver the Required Records for the quarter ending June 30, 2026, as required by Loan Agreement Section 8.02.

137. Events of Default have occurred under Sections 14.01(a)(5), 14.01(a)(6)(A), and 14.01(a)(6)(D) of the 345 Loan Agreement because their execution of recordation of the 345 Restrictive Covenant prohibiting the sale or encumbrance of the 345 Properties resulted in misrepresentations that (i) there were not any liens recorded against the 345 Properties other than liens for taxes not yet due, and (ii) the execution of the 345 Loan Documents would not breach any instrument to which the 345 Defendants were a party.

138. By reason of the foregoing, the 345 Defendants are jointly and severally liable to Wells Fargo Lender for breach of the 345 Loan Agreement in an amount to be determined at trial, but not less than $15,712,000.00, together with all accrued and unpaid interest (including interest at the Default Rate), and Wells Fargo Lender's attorneys' fees and costs incurred in prosecuting this action, with interest thereon.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Breach of the 365 Loan Agreement)**

139. Lender repeats and realleges each of the allegations set forth in paragraphs 1 through 138 of this Complaint as if fully set forth herein.

140. The 365 Loan Agreement is a valid and binding agreement.

141. Lender, at all relevant times, performed its obligations under the 365 Loan Agreement.

142. The 365 Defendants have each breached the 365 Loan Agreement and caused one or more Events of Default to occur thereunder.

143. An Event of Default has occurred under Section 14.01(a)(4) of the 365 Loan Agreement because the 365 12th Avenue Defendant took out an unauthorized loan in breach of Section 4.02(d)(1)(E) of the 365 Loan Agreement.

144. An Event of Default has occurred under Section 14.01(b)(1) of the 365 Loan Agreement because the 365 Defendants failed to replace Decedent Steiner as Guarantor within one year of his death on January 9, 2025, as required by Loan Agreement Section 11.03(e).

145. An Event of Default has occurred under Section 14.01(a)(1) of the 365 Loan Agreement because the 365 Defendants failed to make their July 2026 and August 2026 Monthly Debt Service payments and have also failed to pay all amounts due under the Loan Documents following Lenders' acceleration of the debt.

146. An Event of Default has occurred under Section 14.01(a)(13) of the 365 Loan Agreement because, following the commencement of a Cash Management Period, the 365 Defendants failed to comply with the lockbox requirements set forth in Loan Agreement Section 4.02(j) and those breaches have yet to be cured.

147. An Event of Default has occurred under Section 14.01(a)(18) of the 365 Loan Agreement because the 365 Defendants failed to timely deliver the Required Records for the quarter ending June 30, 2026, as required by Loan Agreement Section 8.02.

148. Events of Default have occurred under Sections 14.01(a)(5), 14.01(a)(6)(A), and 14.01(a)(6)(D) of the 365 Loan Agreement because their execution of recordation of the 365 Restrictive Covenant prohibiting the sale or encumbrance of the 365 Properties resulted in misrepresentations that (i) there were not any liens recorded against the 365 Properties other than liens for taxes not yet due, and (ii) the execution of the 365 Loan Documents would not breach any instrument to which the 365 Defendants were a party.

149. An Event of Default has occurred under Section 14.01(a)(14) because the Tax Lien was recorded against the 365 Properties and the 365 Defendants did not remove the Tax Lien of record within thirty (30) days of its recordation.

150. By reason of the foregoing, the 365 Defendants are jointly and severally liable to Wells Fargo Lender for breach of the 365 Loan Agreement in an amount to be determined at trial, but not less than $16,425,000.00, together with all accrued and unpaid interest (including interest at the Default Rate), and Wells Fargo Lender’s attorneys’ fees and costs incurred in prosecuting this action, with interest thereon.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Breach of the Lehman Loan Agreement)**

151. Lender repeats and realleges each of the allegations set forth in paragraphs 1 through 150 of this Complaint as if fully set forth herein.

152. The Lehman Loan Agreement is a valid and binding agreement.

153. Lender, at all relevant times, performed its obligations under the Lehman Loan Agreement.

154. The Lehman Defendant has breached the Lehman Loan Agreement and caused one or more Events of Default to occur thereunder.

155. An Event of Default has occurred under Section 14.01(b)(1) of the Lehman Loan Agreement because the Lehman Defendant failed to replace Decedent Steiner as Guarantor within one year of his death on January 9, 2025, as required by Loan Agreement Section 11.03(e).

156. An Event of Default has occurred under Section 14.01(a)(1) of the Lehman Loan Agreement because the Lehman Defendant failed to make its July 2026 and August 2026 Monthly Debt Service payments and has also failed to pay all amounts due under the Loan Documents following Lenders' acceleration of the debt.

157. An Event of Default has occurred under Section 14.01(a)(13) of the Lehman Loan Agreement because, following the commencement of a Cash Management Period, the Lehman Defendant failed to comply with the lockbox requirements set forth in Loan Agreement Section 4.02(j) and those breaches have yet to be cured.

158. An Event of Default has occurred under Section 14.01(a)(18) of the Lehman Loan Agreement because the Lehman Defendant failed to timely deliver the Required Records for the quarter ending June 30, 2026, as required by Loan Agreement Section 8.02.

159. An Event of Default has occurred under Section 14.01(a)(14) of the Lehman Loan Agreement because the Vertical Systems Mechanic's Lien attached to the Lehman Mortgaged Property and remained undischarged of record for more than thirty (30) days after recordation.

160. By reason of the foregoing, the Lehman Defendant is liable to Wells Fargo Lender for breach of the Lehman Loan Agreement in an amount to be determined at trial, but not less than $14,570,000.00, together with all accrued and unpaid interest (including interest at the Default

Rate), and Wells Fargo Lender's attorneys' fees and costs incurred in prosecuting this action, with interest thereon.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(Breach of the Mega 712 Broadway Loan Agreement)**

161. Lender repeats and realleges each of the allegations set forth in paragraphs 1 through 160 of this Complaint as if fully set forth herein.

162. The Mega 712 Broadway Loan Agreement is a valid and binding agreement.

163. Lender, at all relevant times, performed its obligations under the Mega 712 Broadway Loan Agreement.

164. The Mega Defendant has breached the Mega Loan Agreement and caused one or more Events of Default to occur thereunder.

165. An Event of Default has occurred under Section 14.01(b)(1) of the Mega Loan Agreement because the Mega Defendant failed to replace Decedent Steiner as Guarantor within one year of his death on January 9, 2025, as required by Loan Agreement Section 11.03(e).

166. An Event of Default has occurred under Section 14.01(a)(1) of the Mega Loan Agreement because the Mega Defendant failed to make its July 2026 and August 2026 Monthly Debt Service payments and has also failed to pay all amounts due under the Loan Documents following Lenders' acceleration of the debt.

167. An Event of Default has occurred under Section 14.01(a)(13) of the Mega Loan Agreement because, following the commencement of a Cash Management Period, the Mega Defendant failed to comply with the lockbox requirements set forth in Loan Agreement Section 4.02(j) and those breaches have yet to be cured.

168. An Event of Default has occurred under Section 14.01(a)(18) of the Mega Loan Agreement because the Mega Defendant failed to timely deliver the Required Records for the quarter ending June 30, 2026, as required by Loan Agreement Section 8.02.

169. Events of Default have occurred under Sections 14.01(a)(5), 14.01(a)(6)(A), and 14.01(a)(6)(D) of the Mega Loan Agreement because the Mega Defendant's execution of recordation of the Mega Restrictive Covenant prohibiting the sale or encumbrance of the Mega Property resulted in misrepresentations that (i) there were not any liens recorded against the Mega Property other than liens for taxes not yet due, and (ii) the execution of the Mega Loan Documents would not breach any instrument to which the Mega Defendant was a party.

170. By reason of the foregoing, the Mega Defendant is liable to Wilmington Lender for breach of the Mega Loan Agreement in an amount to be determined at trial, but not less than $9,975,000.00, together with all accrued and unpaid interest (including interest at the Default Rate), and Wilmington Lender's attorneys' fees and costs incurred in prosecuting this action, with interest thereon.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**

**(Recourse Liability against 345 Defendants)**

171. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 170 of this Complaint as if fully set forth herein.

172. The 345 Loan Agreement is a valid and binding agreement.

173. Wells Fargo Lender, at all relevant times, performed its obligations under the 345 Loan Agreement.

174. Section 3.02(b)(2) of the 345 Loan Agreement provides that the 345 Defendants shall be personally liable for repayment of all of the Indebtedness if a Transfer occurs "that is not permitted under this Loan Agreement or any other Loan Document."

175. Section 3.02(b)(1) of the 345 Loan Agreement provides that the 345 Defendants shall be personally liable for repayment of all of the Indebtedness if they fail "to comply with the . . . requirements of Section 4.02(d)."

176. Section 4.02(d)(1)(E) of each Loan Agreement provides that the 345 Defendants shall not incur any additional indebtedness other than the 345 Loan.

177. Section 3.02(b)(10) of the 345 Loan Agreement provides that the 345 Defendants shall be personally liable for repayment of all of the Indebtedness if they "fail[] to establish a Deposit Account upon the occurrence of a Cash Management Period in accordance with [Loan Agreement] Section 4.02(j)."

178. Section 3.02(b)(4) of the 345 Loan Agreement provides that the 345 Defendants shall be personally liable for the repayment of all of the Indebtedness if the 345 Defendants commit fraud or make an intentional misrepresentation in connection with the application for the 345 Loan.

179. The 345 Defendants are personally liable for the entire Indebtedness because they (i) took out an unauthorized loan in violation of Section 4.02(d)(1)(E) of the 345 Loan Agreement, (ii) failed to replace Decedent Steiner as Guarantor within one year of his death on January 9, 2025, which constitutes an impermissible Transfer, (iii) failed to comply with the requirements of Loan Agreement Section 4.02(j), including the obligation to establish a Deposit Account pursuant to a DACA, and (iv) made multiple misrepresentations in the 345 Loan Agreement due to their knowledge and execution of the 345 Restrictive Covenant.

180. Section 3.02(a) of the 345 Loan Agreement further provides that Borrower shall be personally liable to Lender for the portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of, among other things: (i) the failure to pay Rents to Lender following an Event of Default (Section 3.02(a)(1)); (ii) the failure to comply with the obligations to deliver Required Records (Section 3.02(a)(4)); (iii) waste or abandonment of the Mortgaged Property (Section 3.02(a)(7)); and (iv) the breach of the covenants contained in Loan Agreement Section 4.02(j) (Section 3.02(a)(11)).

181. The 345 Defendants are personally liable to Wells Fargo Lender for any losses or damages caused because of their failure to (i) remit Rents following the various Events of Default described herein; (ii) deliver Required Records in accordance with the 345 Loan Documents; (iii) keep the properties in good repair and not commit waste; and (iv) comply with the various cash-management covenants set forth in Section 4.02(j).

182. By reason of the foregoing, the 345 Defendants should be adjudged jointly and severally personally liable to Wells Fargo Lender, under the 345 Loan Agreement, (i) for the full and immediate payment of the entire Indebtedness under the 345 Loan, in an amount to be determined at trial but not less than $15,712,000.00, including the outstanding principal, all accrued and unpaid interest (including interest at the Default Rate), and all other sums due to Lender under the 345 Loan Documents, together with Wells Fargo Lender's attorneys' fees and costs incurred in prosecuting this action, and alternatively, (ii) for the full and immediate payment of losses and damages suffered by Wells Fargo Lender associated with the Guaranteed Obligations described in Sections 3.02(a)(1), (4), (7) and (11) of the 345 Loan Agreement and all other sums due to Lender under the 345 Loan Documents, together with Wells Fargo Lender's attorneys' fees and costs incurred in prosecuting this action.

**AS AND FOR A NINTH CAUSE OF ACTION**

**(Recourse Liability against 365 Defendants)**

183. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 182 of this Complaint as if fully set forth herein.

184. The 365 Loan Agreement is a valid and binding agreement.

185. Wells Fargo Lender, at all relevant times, performed its obligations under the 365 Loan Agreement.

186. Section 3.02(b)(1) of the 365 Loan Agreement provides that the 365 Defendants shall be personally liable for repayment of all of the Indebtedness if they fail "to comply with the . . . requirements of Section 4.02(d)."

187. Section 4.02(d)(1)(E) of the 365 Loan Agreement provides that the 365 Borrower shall not incur any additional indebtedness other than the 365 Loan.

188. Section 3.02(b)(2) of the 365 Loan Agreement provides that the 365 Defendants shall be personally liable for repayment of all of the Indebtedness if a Transfer occurs "that is not permitted under this Loan Agreement or any other Loan Document."

189. Section 3.02(b)(10) of the 365 Loan Agreement provides that the 365 Defendants shall be personally liable for repayment of all of the Indebtedness if they "fail[] to establish a Deposit Account upon the occurrence of a Cash Management Period in accordance with [Loan Agreement] Section 4.02(j)."

190. The 365 Defendants are personally liable for the entire Indebtedness because they (i) took out an unauthorized loan in violation of Section 4.02(d)(1)(E) of the 365 Loan Agreement, (ii) failed to replace Decedent Steiner as Guarantor within one year of his death on January 9, 2025, which constitutes an impermissible Transfer, (iii) failed to comply with the requirements of

Loan Agreement Section 4.02(j), including the obligation to establish a Deposit Account pursuant to a DACA, and (iv) made multiple misrepresentations in the 365 Loan Agreement due to their knowledge and execution of the 365 Restrictive Covenant.

191. Section 3.02(a) of the 365 Loan Agreement further provides that Borrower shall be personally liable to Lender for the portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of, among other things: (i) the failure to pay Rents to Lender following an Event of Default (Section 3.02(a)(1)); (ii) the failure to comply with the obligations to deliver Required Records (Section 3.02(a)(4)); (iii) waste or abandonment of the Mortgaged Property (Section 3.02(a)(7)); and (iv) the breach of the covenants contained in Loan Agreement Section 4.02(j) (Section 3.02(a)(11)).

192. The 365 Defendants are personally liable to Wells Fargo Lender for any losses or damages caused because of their failure to (i) remit Rents following the various Events of Default described herein, (ii) deliver Required Records in accordance with the 365 Loan Documents, (iii) keep the properties in good repair and not commit waste, and (iv) comply with the various cash-management covenants set forth in Section 4.02(j).

193. By reason of the foregoing, the 365 Defendants should be adjudged jointly and severally personally liable to Wells Fargo Lender, under the 365 Loan Agreement, (i) for the full and immediate payment of the entire Indebtedness under the 365 Loan, in an amount to be determined at trial but not less than $16,425,000.00, including the outstanding principal, all accrued and unpaid interest (including interest at the Default Rate), and all other sums due to Lender under the 365 Loan Documents, together with Wells Fargo Lender's attorneys' fees and costs incurred in prosecuting this action, and alternatively, (ii) for the full and immediate payment of losses and damages suffered by Wells Fargo Lender associated with the Guaranteed Obligations

described in Sections 3.02(a)(1), (4), (7) and (11) of the 365 Loan Agreement and all other sums due to Lender under the 365 Loan Documents, together with Wells Fargo Lender's attorneys' fees and costs incurred in prosecuting this action.

**AS AND FOR A TENTH CAUSE OF ACTION**

**(Recourse Liability against Lehman Defendant)**

194. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 193 of this Complaint as if fully set forth herein.

195. The Lehman Loan Agreement is a valid and binding agreement.

196. Wells Fargo Lender, at all relevant times, performed its obligations under the Lehman Loan Agreement.

197. Section 3.02(b)(2) of the Lehman Loan Agreement provides that Lehman Defendant shall be personally liable for repayment of all of the Indebtedness if a Transfer occurs "that is not permitted under this Loan Agreement or any other Loan Document."

198. Section 3.02(b)(10) of the Lehman Loan Agreement provides that the Lehman Defendant shall be personally liable for repayment of all of the Indebtedness if it "fails to establish a Deposit Account upon the occurrence of a Cash Management Period in accordance with [Loan Agreement] Section 4.02(j)."

199. The Lehman Defendant is personally liable for the entire Indebtedness because it failed to (i) replace Decedent Steiner as Guarantor within one year of his death on January 9, 2025 and discharge the Vertical Systems Mechanic's Lien within 30 days of its recordation, each of which constitutes an impermissible Transfer, and (ii) comply with the requirements of Loan Agreement Section 4.02(j), including the obligation to establish a Deposit Account pursuant to a DACA.

200. Section 3.02(a) of the Lehman Loan Agreement further provides that Borrower shall be personally liable to Lender for the portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of, among other things: (i) the failure to pay Rents to Lender following an Event of Default (Section 3.02(a)(1)); (ii) the failure to comply with the obligations to deliver Required Records (Section 3.02(a)(4)); (iii) waste or abandonment of the Mortgaged Property (Section 3.02(a)(7)); and (iv) the breach of the covenants contained in Loan Agreement Section 4.02(j) (Section 3.02(a)(11)).

201. The Lehman Defendant is personally liable to Wells Fargo Lender for any losses or damages caused because of its failure to (i) remit Rents following the various Events of Default described herein, (ii) deliver Required Records in accordance with the Lehman Loan Documents, (iii) keep the property in good repair and not commit waste, and (iv) comply with the various cash-management covenants set forth in Section 4.02(j).

202. By reason of the foregoing, the Lehman Defendant should be adjudged personally liable to Wells Fargo Lender, under the Lehman Loan Agreement, (i) for the full and immediate payment of the entire Indebtedness under the Lehman Loan, in an amount to be determined at trial but not less than $14,570,000.00, including the outstanding principal, all accrued and unpaid interest (including interest at the Default Rate), and all other sums due to Lender under the Lehman Loan Documents, together with Wells Fargo Lender's attorneys' fees and costs incurred in prosecuting this action, and alternatively, (ii) for the full and immediate payment of losses and damages suffered by Wells Fargo Lender associated with the Guaranteed Obligations described in Sections 3.02(a)(1), (4), (7) and (11) of the Lehman Loan Agreement and all other sums due to Lender under the Lehman Loan Documents, together with Wells Fargo Lender's attorneys' fees and costs incurred in prosecuting this action.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION**

**(Recourse Liability against Mega Defendant)**

203. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 202 of this Complaint as if fully set forth herein.

204. The Mega 712 Broadway Loan Agreement is a valid and binding agreement.

205. Wilmington Lender, at all relevant times, performed its obligations under the Mega 712 Broadway Loan Agreement.

206. Section 3.02(b)(1) of the Mega Loan Agreement provides that the Mega Defendant shall be personally liable for repayment of all of the Indebtedness if a Transfer occurs "that is not permitted under this Loan Agreement or any other Loan Document."

207. Section 3.02(b)(10) of the Mega Loan Agreement provides that the Mega Defendant shall be personally liable for repayment of all of the Indebtedness if it "fails to establish a Deposit Account upon the occurrence of a Cash Management Period in accordance with [Loan Agreement] Section 4.02(j)."

208. The Mega Defendant is personally liable for the entire Indebtedness because it (i) failed to replace Decedent Steiner as Guarantor within one year of his death on January 9, 2025, which constitutes an impermissible Transfer, (ii) failed to comply with the requirements of Loan Agreement Section 4.02(j), including the obligation to establish a Deposit Account pursuant to a DACA, and (iii) made multiple misrepresentations in the Mega Loan Agreement due to its knowledge and execution of the Mega Restrictive Covenant.

209. Section 3.02(a) of the Mega Loan Agreement further provides that Borrower shall be personally liable to Lender for the portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of, among other things: (i) the failure to pay Rents to Lender

following an Event of Default (Section 3.02(a)(1)); (ii) the failure to comply with the obligations to deliver Required Records (Section 3.02(a)(4)); (iii) waste or abandonment of the Mortgaged Property (Section 3.02(a)(7)); and (iv) the breach of the covenants contained in Loan Agreement Section 4.02(j) (Section 3.02(a)(11)).

210. The Mega Defendant is personally liable to Wilmington Lender for any losses or damages caused because of its failure to (i) remit Rents following the various Events of Default described herein, (ii) deliver Required Records in accordance with the Mega Loan Documents, (iii) keep the property in good repair and not commit waste, and (iv) comply with the various cash-management covenants set forth in Section 4.02(j).

211. By reason of the foregoing, the Mega Defendant should be adjudged personally liable to Wilmington Lender, under the Mega Loan Agreement, (i) for the full and immediate payment of the entire Indebtedness under the Mega Loan, in an amount to be determined at trial but not less than $9,975,000.00, including the outstanding principal, all accrued and unpaid interest (including interest at the Default Rate), and all other sums due to Lender under the Mega Loan Documents, together with Wilmington Lender's attorneys' fees and costs incurred in prosecuting this action, and alternatively, (ii) for the full and immediate payment of losses and damages suffered by Wilmington Lender associated with the Guaranteed Obligations described in Sections 3.02(a)(1), (4), (7) and (11) of the Mega Loan Agreement and all other sums due to Lender under the Mega Loan Documents, together with Wilmington Lender's attorneys' fees and costs incurred in prosecuting this action.

## AS AND FOR A TWELFTH CAUSE OF ACTION
## (Recourse Liability against Guarantor)

212. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 211 of this Complaint as if fully set forth herein.

213. Each Guaranty is a valid guaranty agreement executed by and enforceable against Steiner Estate Defendant in its capacity as administrator of Guarantor's estate.

214. Guarantor was the one-hundred percent (100%) owner of all Borrower Defendants and materially benefitted from Lenders' making the Loans.

215. Plaintiffs are the owners and holders of the Guaranties and are entitled to all of the rights and remedies set forth therein.

216. Guarantor guaranteed the payment of the "Guaranteed Obligations" which consist of (i) all personal liabilities owed by Borrowers to Lenders pursuant to Article 3 of each Loan Agreement, and (ii) all obligations in the Guaranties to pay Lenders' costs and expenses.

217. Section 3.02(b)(1) of the Loan Agreements provides that Borrower shall be personally liable for repayment of all of the Indebtedness if a Transfer occurs "that is not permitted under this Loan Agreement or any other Loan Document."

218. Section 3.02(b)(10) of the Loan Agreements provides that Borrower shall be personally liable for repayment of all of the Indebtedness if Borrower "fails to establish a Deposit Account upon the occurrence of a Cash Management Period in accordance with [Loan Agreement] Section 4.02(j)."

219. The Guarantor is personally liable for the entire Indebtedness for all Loans because (i) all Borrower Defendants failed to replace Decedent Steiner as Guarantor within one year of his death on January 9, 2025, which constitutes an impermissible Transfer, (ii) all Borrower Defendants failed to comply with the requirements of Loan Agreement Section 4.02(j), including the obligation to establish Deposit Accounts pursuant to DACAs, (iii) the Lehman Defendant failed to discharge the Vertical Systems Mechanic's Lien within thirty (30) days of its recordation, and (iv) the 345 Defendants, 365 Defendants and Mega Defendant made multiple

misrepresentations in the Loan Agreements for their respective Loans due to each of those Defendants' knowledge and execution of the pertinent Restrictive Covenant.

220. Section 3.02(a) of the Loan Agreements further provides that Borrower shall be personally liable to Lenders for the portion of the Indebtedness equal to any loss or damage suffered by Lenders as a result of, among other things: (i) the failure to pay Rents to Lender following an Event of Default (Section 3.02(a)(1)); (ii) the failure to comply with the obligations to deliver Required Records (Section 3.02(a)(4)); (iii) waste or abandonment of the Mortgaged Property (Section 3.02(a)(7)); and (iv) breach of the covenants contained in Loan Agreement Section 4.02(j) (Section 3.02(a)(11)).

221. The Borrower Defendants and, therefore, the Guarantor are personally liable to Wells Fargo Lender for any losses or damages caused because of their failure to (i) remit Rents following the various Events of Default described herein, (ii) deliver Required Records in accordance with the Loan Documents; (iii) keep the properties in good repair and not commit waste; and (iv) comply with the various cash-management covenants set forth in Section 4.02(j).

222. By reason of the foregoing, Guarantor should be adjudged jointly and severally personally liable to Lenders, under the Guaranties, (i) for the full and immediate payment of the entire Indebtedness under the Loans, in an amount to be determined at trial but not less than $56,682,000.00, including the outstanding principal, all accrued and unpaid interest (including interest at the Default Rate), and all other sums due to Lenders under the Guaranties, together with Lenders' attorneys' fees and costs incurred in prosecuting this action, and alternatively, (ii) for the full and immediate payment of losses and damages suffered by Lenders associated with the Guaranteed Obligations described in Sections 3.02(a)(1), (4), (7) and (11) of the Loan Agreements

and all other sums due to Lenders under the Guaranties, together with Lenders' attorneys' fees and costs incurred in prosecuting this action.

**WHEREFORE**, Lender respectfully requests that the Court enter a judgment against the Defendants as follows:

(a) awarding Lender a money judgment against the 345 Defendants, jointly and severally, for their breach of the 345 Loan Agreement in an amount to be determined at trial, but not less than $15,712,000.00, together with all accrued and unpaid interest (including interest at the Default Rate), and Lender's attorneys' fees and costs incurred in prosecuting this action, with interest thereon;

(b) awarding Lender a money judgment against the 365 Defendants, jointly and severally, for their breach of the 365 Loan Agreement in an amount to be determined at trial, but not less than $16,425,000.00, together with all accrued and unpaid interest (including interest at the Default Rate), and Lender's attorneys' fees and costs incurred in prosecuting this action, with interest thereon;

(c) awarding Lender a money judgment against the Lehman Defendant for its breach of the Lehman Loan Agreement in an amount to be determined at trial, but not less than $14,570,000.00, together with all accrued and unpaid interest (including interest at the Default Rate), and Lender's attorneys' fees and costs incurred in prosecuting this action, with interest thereon;

(d) awarding Lender a money judgment against the Mega Defendant for its breach of the Mega 712 Broadway Loan Agreement in an amount to be determined at trial, but not less than $9,975,000.00, together with all accrued and unpaid interest (including

interest at the Default Rate), and Lender's attorneys' fees and costs incurred in prosecuting this action, with interest thereon;

(e) awarding Wells Fargo Lender a money judgment against the 345 Defendants, jointly and severally, for their fraud in an amount to be determined at trial, but not less than $15,712,000.00, together with interest, costs, and attorneys' fees, and/or declaring the 345 Restrictive Covenant void and unenforceable as against Wells Fargo Lender;

(f) awarding Wells Fargo Lender a money judgment against the 365 Defendants, jointly and severally, for their fraud in an amount to be determined at trial, but not less than $16,425,000.00, together with interest, costs, and attorneys' fees, and/or declaring the 365 Restrictive Covenant void and unenforceable as against Wells Fargo Lender;

(g) awarding Wilmington Lender a money judgment against the Mega Defendant for its fraud in an amount to be determined at trial, but not less than $9,975,000.00, together with interest, costs, and attorneys' fees, and/or declaring the Mega Restrictive Covenant void and unenforceable as against Wilmington Lender;

(h) adjudging each Borrower personally liable under its respective Loan Agreement for the full and immediate payment of the entire Indebtedness under each Loan, including the outstanding principal of each Loan, all accrued and unpaid interest (including interest at the Default Rate), and all other sums due to Lender under the Loan Documents;

(i) adjudging Guarantor personally liable under each Recourse Guaranty for the full and immediate payment of the entire Indebtedness under each Loan, including the outstanding principal of each Loan, all accrued and unpaid interest (including interest at the Default Rate), and all other sums due to Lender under the Loan Documents; or, alternatively,

(j) in accordance with 28 U.S.C. § 754 and the Borrower Defendants' consent to receivership in each Security Instrument, appointing an equitable receiver for each Property during the pendency of this action to:

(i) receive and collect the Rents from each Property,

(ii) take the necessary measures to operate, improve, and remediate the Property in order to protect and safeguard the collateral for each of the Loans,

(iii) assume complete control of the Borrower Defendants, and

(iv) as appropriate, market and sell the Property free of all liens and encumbrances;

(k) enjoining Defendants, and their respective agents, partners, servants, employees, and all persons acting under, in concert with, or on behalf of any of them, from and in any manner, directly or indirectly, demanding, collecting, discounting, receiving, or in any way diverting any receipts, rents, income, and profits from the Properties and prohibiting them from entering into any new leases or lease extensions;

(l) ordering the Defendants to relinquish possession of the Properties and the receipts, rents, income, and profits therefrom to the receiver;

(m) ordering Defendants to turn over to the receiver all personal property, fixtures, goods, documents, books, records, papers, and accounts of the Defendants relating thereto;

(n) enjoining Defendants from interfering with the receiver; and

(o) awarding Lender such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 17, 2026

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: */s/ Scott L. Walker*

Scott L. Walker
Howard Schub
Paige Epstein
330 Madison Avenue, 27th Floor
New York, NY 10017
Tel.: (212) 413-9011
Email: scott.walker@nelsonmullins.com
howard.schub@nelsonmullins.com
paige.epstein@nelsonmullins.com

**SCHEDULE 1**

**BORROWERS, LOANS & COLLATERAL PROPERTIES**

| **Loan** | **Borrower(s)** | **Original Principal Amount** | **Collateral Property Street Address** | **City, County, State** |
|---|---|---|---|---|
| "345 Loan" | 345 Fair St LLC<br><br>328 33rd St LLC<br><br>185 E. 33rd St LLC | $15,712,000.00 | 345-347 Fair Street<br><br>328-336 East 33rd Street<br><br>181-193 East 33rd Street | Paterson, Passaic, NJ<br><br>Paterson, Passaic, NJ<br><br>Paterson, Passaic, NJ |
| "365 Loan" | 365 12th Ave LLC<br><br>198 President St LLC | $16,425,000.00 | 365 12th Avenue<br><br>198 President Street | Paterson, Passaic, NJ<br><br>Passaic, Passaic, NJ |
| "Lehman Loan" | 2650 Lehman LLC | $14,570,000.00 | 2650 Lehman Road | Cincinnati, Hamilton, OH |
| "Mega Loan" | Mega 712 Broadway LLC | $9,975,000.00 | 522 and 712 Broadway | Westville, Gloucester, NJ |

**SCHEDULE 2**

**LOAN AGREEMENTS, NOTES & ALLONGES**

| Loan | Loan Agreement | Note | Allonges |
|---|---|---|---|
| "345 Loan Agreement" | Loan and Security Agreement dated as of September 15, 2021 by and among "Original Lender"[2] and the 345 Defendants<br><br>Stated maturity: October 1, 2031 | Promissory Note dated as of September 15, 2021<br><br>Obligors: 345 Defendants | Original Lender → "AJPLF Lender"[3], September 15, 2021<br><br>AJPLF Lender → Original Lender, October 13, 2021<br><br>Original Lender → Wells Fargo Lender, October 13, 2021 |
| "365 Loan Agreement" | Loan and Security Agreement dated as of September 15, 2021 by and among Original Lender and the 365 Defendants<br><br>Stated maturity: October 1, 2031 | Promissory Note, dated as of September 15, 2021<br><br>Obligors: 365 Defendants | Original Lender → AJPLF Lender, September 15, 2021<br><br>AJPLF Lender → Original Lender, October 13, 2021<br><br>Original Lender → Wells Fargo Lender, October 13, 2021 |
| "Lehman Loan Agreement" | Loan and Security Agreement dated as of September 15, 2021 by and among Original Lender and the Lehman Defendant<br><br>Stated maturity: October 1, 2031 | Promissory Note dated as of September 15, 2021<br><br>Obligor: Lehman Defendant | Original Lender → AJPLF Lender, September 15, 2021<br><br>AJPLF Lender → Original Lender, October 13, 2021<br><br>Original Lender → Wells Fargo Lender, October 13, 2021 |
| "Mega Loan Agreement" | Loan and Security Agreement dated as of November 30, 2021 by and among Original Lender and the Mega Defendant<br><br>Stated maturity: December 1, 2031 | Promissory Note dated November 30, 2021<br><br>Obligor: Mega Defendant | Original Lender → AJPLF Lender, November 30, 2021<br><br>AJPLF Lender → Original Lender, February 10, 2022<br><br>Original Lender → Wilmington Lender, February 14, 2022 |

[2] Arbor Private Label, LLC
[3] Arbor JPM PL Funding, LLC

## SCHEDULE 3

## SECURITY INSTRUMENTS & INITIAL RECORDING

| Loan | Instrument | Recording Information |
|---|---|---|
| 345 Loan | Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, made by the 345 Defendants in favor of Original Lender, dated as of September 15, 2021 | Recorded on September 24, 2021 in the Official Land Records of Passaic County, NJ as Instrument No. 2021060854, Book M17466, Page 114 |
| 365 Loan | Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, made by the 365 Defendants in favor of Original Lender, dated as of September 15, 2021 | Recorded on September 24, 2021 in the Official Land Records of Passaic County, NJ as Instrument No. 2021060856, Book M17466, Page 144 |
| Lehman Loan | Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, made by the Lehman Defendant in favor of Original Lender, dated as of September 15, 2021 | Recorded on September 17, 2021 in the Official Land Records of Hamilton County, OH as Document No. 2021-0112562, Official Record Book 14504, Page 02410 |
| Mega Loan | Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, made by the Mega Defendant in favor of Original Lender, dated as of November 30, 2021 | Recorded on December 2, 2021 in the Official Land Records of Gloucester County, NJ as Docket No. 64919, Mortgage Book 17338, Page 225 |

## SCHEDULE 4

## RECOURSE GUARANTIES

| Loan | Guarantor | Recourse Guaranty | Min. Net Worth | Min. Liquidity |
|---|---|---|---|---|
| 345 Loan | Mendel Steiner | Guaranty of Non-Recourse Obligations, 09/15/2021 | $15,712,000.00 | $1,571,200.00 |
| 365 Loan | Mendel Steiner | Guaranty of Non-Recourse Obligations, 09/15/2021 | $16,425,000.00 | $1,642,500.00 |
| Lehman Loan | Mendel Steiner | Guaranty of Non-Recourse Obligations, 09/15/2021 | $14,570,000.00 | $1,457,000.00 |
| Mega Loan | Mendel Steiner | Guaranty of Non-Recourse Obligations, 11/30/2021 | $9,975,000.00 | $997,500.00 |

## SCHEDULE 5

## SECURITIZATION TRUSTS

| Loan | Trustee | Securitization Trust |
|---|---|---|
| 345 Loan | Wells Fargo Bank, N.A., as Trustee | Arbor Multifamily Mortgage Securities Trust 2021-MF3, Multifamily Mortgage Pass-Through Certificates, Series 2021-MF3 |
| 365 Loan | Wells Fargo Bank, N.A., as Trustee | Arbor Multifamily Mortgage Securities Trust 2021-MF3, Multifamily Mortgage Pass-Through Certificates, Series 2021-MF3 |
| Lehman Loan | Wells Fargo Bank, N.A., as Trustee | Arbor Multifamily Mortgage Securities Trust 2021-MF3, Multifamily Mortgage Pass-Through Certificates, Series 2021-MF3 |
| Mega Loan | Wilmington Trust, N.A., as Trustee | Arbor Multifamily Mortgage Securities Trust 2022-MF4, Multifamily Mortgage Pass-Through Certificates, Series 2022-MF4 |

**SCHEDULE 6**

**ASSIGNMENT OF LOAN DOCUMENTS**

| Loan | Assignments | State UCCs | County UCCs |
|---|---|---|---|
| 345 Loan | Assignments of Mortgage<br>Passaic County, NJ<br><br>Original Lender → AJPLF Lender<br>11/18/2021<br>Inst. 2021072344, Book AS777, Page 1<br><br>AJPLF Lender → Original Lender<br>02/16/2022<br>Inst. 2022010023, Book AS788, Page 49<br><br>Original Lender → WF Trustee (2021-MF3)<br>02/16/2022<br>Inst. 2022010024, Book AS788, Page 57 | UCC-3<br>Filing No. 55464231<br><br>Original Lender → AJPLF Lender<br>11/17/2021<br><br>AJPLF Lender → Original Lender<br>02/15/2022<br><br>Original Lender → WF Trustee (2021-MF3)<br>2/16/2022 | UCC-3<br><br>Original Lender → AJPLF Lender<br>Inst. 2022015550, File 106177<br><br>AJPLF Lender → Original Lender<br>Inst. 2022015551, File 106178<br><br>Original Lender → WF Trustee (2021-MF3)<br>Inst. 2022015552, File 106179 |
| 365 Loan | Assignments of Mortgage<br>Passaic County, NJ<br><br>Original Lender → AJPLF Lender<br>2/16/2022<br>Inst. 2022009937, Book AS788, Page 11<br><br>AJPLF Lender → Original Lender<br>2/16/2022<br>Inst. 2022009938, Book AS788, Page 19<br><br>Original Lender → WF Trustee (2021-MF3)<br>2/16/2022<br>Inst. 2022009939, Book AS788, Page 27 | UCC-3<br>Filing No. 55464765<br><br>Original Lender → AJPLF Lender<br>02/15/2022<br><br>AJPLF Lender → Original Lender<br>02/15/2022<br><br>Original Lender → WF Trustee (2021-MF3)<br>02/15/2022 | UCC-3<br><br>Original Lender → AJPLF Lender<br>03/09/2022<br>Inst. 2022014310, File 106116<br><br>AJPLF Lender → Original Lender<br>03/09/2022<br>Inst. 2022014311, File 106117<br><br>Original Lender → WF Trustee (2021-MF3)<br>03/09/2022<br>Inst. 2022014312, File 106118 |
| Lehman Loan | Assignments of Mortgage<br>Hamilton County, OH | UCC-1<br>09/17/2021 | UCC-1<br>09/17/2021 |

| Loan | Assignments | State UCCs | County UCCs |
|---|---|---|---|
| | Original Lender → AJPLF Lender<br>10/05/2021<br>Doc. 2021-0120014, O.R. 14516/00549<br><br>AJPLF Lender → Original Lender<br>02/16/2022<br>Doc. 2022-0017607, O.R. 14606/01924<br><br>Original Lender → WF Trustee (2021-MF3)<br>02/16/2022<br>Doc. 2022-0017609, O.R. 14606/01939 | File No. OH00256429642 | Doc. 2021-0112563, O.R. 14504/2437<br><br>Original Lender → AJPLF Lender<br>11/17/2021<br>Doc. 2021-0139351, O.R. 14546/03389<br><br>AJPLF Lender → Original Lender<br>02/16/2022<br>Doc. 2022-0017608, O.R. 14606/01932<br><br>Original Lender → WF Trustee (2021-MF3)<br>02/16/2022<br>Doc. 2022-0017610, O.R. 14606/01947 |
| Mega Loan | Assignment of Mortgage Gloucester County, NJ<br><br>Original Lender → AJPLF Lender<br>12/17/2021<br>Docket 67603, Book 444, Page 40<br><br>AJPLF Lender → Original Lender<br>03/16/2022<br>Docket 12152, Book 449, Page 283<br><br>Original Lender → WT Trustee (2022-MF4)<br>03/16/2022<br>Docket 12153, Book 449, Page 289 | UCC-3<br><br>Original Lender → AJPLF Lender<br><br>AJPLF Lender → Original Lender<br>03/14/2022<br>File 55616003<br><br>Original Lender → WT Trustee (2022-MF4)<br>03/14/2022<br>File 55616003 | UCC-3<br><br>Original Lender → AJPLF Lender<br><br>AJPLF Lender → Original Lender<br>03/22/2022<br>Docket 00018614<br><br>Original Lender → WT Trustee (2022-MF4)<br>03/22/2022<br>Docket 00018615 |